[No. A049789. First Dist., Div. Four. Dec. 19, 1990.]

R. H. MACY & CO., INC., et al., Plaintiffs and Appellants, v. CONTRA COSTA COUNTY, Defendant and Respondent.

**COUNSEL**

Mayer, Brown & Platt, Michael W. McConnell, Horwath & Smith, Don Horwath, Ajalat & Polley, Charles R. Ajalat, Terry L. Polley and Richard J. Ayoob for Plaintiffs and Appellants.

Victor J. Westman, County Counsel, and Dennis C. Graves, Deputy County Counsel, for Defendant and Respondent.

Ronald A. Zumbrun, Anthony T. Caso, Jonathan M. Coupal, Trevor A. Grimm, John K. Van de Kamp, Attorney General, and Arthur C. De Goede, Assistant Attorney General, as Amici Curiae on behalf of Defendant and Respondent.

**OPINION**

**ANDERSON, P. J.—**

## I. INTRODUCTION

The case herein challenges anew the constitutionality of Proposition 13 adopted by the California voters on June 6, 1978 (Cal. Const., art. XIII A,

§§ 1-6 [hereafter Proposition 13 or Article XIII A]). Specifically, appellants attack the change in ownership provisions of Article XIII A which allow the tax assessment to be based upon the fair market value of the property at the time of the ownership change rather than at its 1975 (base year) value. Appellants argue that as far as commercial property is concerned, the change-in-ownership provisions of Article XIII A are unconstitutional because they violate the equal protection and commerce clauses of the federal Constitution and impair interstate mobility (right to travel) as well. In an action brought for a refund of taxes and declaratory relief, the trial court rejected appellants' arguments and entered judgment in favor of respondent county. We are asked to reexamine these questions, especially in light of *Allegheny Pittsburgh Coal Co.* v. *County Com. of Webster County* (1989) 488 U.S. 336 [102 L.Ed.2d 688, 109 S.Ct. 633], a recent United States Supreme Court decision involving a similar tax assessment scheme (hereafter *Allegheny*), which spurs this appeal.

## II. BACKGROUND INFORMATION

### A. *Scheme of Taxation Under Proposition 13*

Unless otherwise provided, in California all real estate is assessed at fair market value for the purposes of taxation. (Cal. Const., art. XIII, § 1 et seq.) One of the most crucial exceptions is carved out by Article XIII A which sets a constitutional limit on the maximum amount of tax that may be levied on real property. That limit on all residential and commercial property is 1 percent of the 1975 base year value which may be enhanced to reflect an inflation rate of no more than 2 percent per year. (Art. XIII A, § 2, subd. (b).) An exception to this rule is supplied in section 2, subdivision (a), which allows the limit to be raised in case a change in ownership has occurred subsequent to the 1975 assessment. In the latter instance, the real property is reappraised at fair market value as of the date of change and the rate of 1 percent is calculated according to the newly established value of the property. (Art. XIII A, § 1, subd. (a), § 2, subd. (a).)[1]

### B. *Factual and Procedural Backdrop*

The facts underlying the dispute herein are simple and undisputed. Appellants (R. C. Macy & Co., Inc., a Delaware corporation and its two

---

[1] Article XIII A, section 1, subdivision (a), provides in part: "The maximum amount of any ad valorem tax on real property shall not exceed One percent (1%) of the full cash value of such property . . . ."

Section 2, subdivision (a), in turn, sets out that "The full cash value means the county assessor's valuation of real property as shown on the 1975-76 tax bill under 'full cash value' *or, thereafter, the appraised value of real property when* purchased, newly constructed, or *a change in ownership has occurred after the 1975 assessment.*" (Italics added.)

wholly owned subsidiaries: Concord Properties Corp. and Macy's California, Inc., hereafter together Macy's) are owners and operators of Macy's department store in Contra Costa County. The department store opened in 1967 and has continued to do business under the same management ever since.

On July 15, 1986, Macy's underwent a corporate restructuring, which constituted a change in ownership within the meaning of Article XIII A, section 2. Prior to restructuring, the tax assessment of the department store was based upon the 1975-1976 value of $3,468,548. Adjusted for inflation of 2 percent per year, the 1987 assessment would have been $4,355,551. As a result of the change in ownership, however, the county assessor reappraised the property and determined its value in the sum of $11,685,026, i.e., $47.50 per square foot.

It is undisputed that Macy's department store, which is located at Sun Valley Mall, has two competitors in the same shopping center: J. C. Penney and Sears and that the two latter stores have not experienced a change in ownership since 1975. The parties stipulated that while the properties of the three competing stores are comparable, Macy's, due to a change in ownership and the ensuing reappraisal, has to pay about 2.5 times the amount of property tax that J. C. Penney and Sears pay.

As a consequence of revaluation of the property at its 1986 fair market value, Macy's was assessed and had to pay an additional tax of $72,947.04 in the 1987 fiscal year. In protest, Macy's filed a timely application for reduction of assessment with the assessment appeals board which was heard and denied. Macy's then filed a claim for refund with respondent county which was also denied. Following the exhaustion of its administrative remedies, Macy's initiated the present lawsuit for declaratory relief and a refund of the supplemental tax paid under protest, claiming, in essence, that the change in ownership provisions of Article XIII A and the statutory and regulatory rules implementing them are unconstitutional both on their face and as applied. After thorough briefing and receipt of extensive documentary evidence, the trial court rejected Macy's claim and rendered judgment for respondent county.

## III. DISCUSSION

Appellants contend that as far as they relate to commercial property, the change in ownership provisions of Proposition 13 are unconstitutional and the supplemental assessments made thereunder are void because the disparate tax levies resulting under the disputed provisions: (a) violate the equal protection clause of the federal Constitution; (b) interfere with interstate

mobility (right to travel); and (c) place undue burden on interstate commerce. We find appellants' renewed attack on the constitutionality of Proposition 13 groundless and affirm the judgment.

A. *The Change in Ownership Provisions of Proposition 13 Do Not Violate the Precepts of Equal Protection*

■ Appellants' principal contention on appeal is that the change-in-ownership provisions codified in Article XIII A, section 2, subdivision (a) (see fn. 1, *ante*) constitute invidious discrimination and, thus, violate the equal protection clause of the Fourteenth Amendment. Appellants, in essence, maintain that the taxation of property acquired after 1975 at its fair market value leads to evergrowing disparities in the taxation of similarly situated property which cannot be justified on any rational basis or reasonable difference in state policy. Appellants insist that the constitutional requirement of "seasonable attainment of a rough equality in tax treatment of similarly situated property owners" (*Allegheny, supra,* 488 U.S. at p. 343 [102 LEd.2d at p. 69]) cannot be achieved under Article XIII A due to a vast gap between the constitutionally allowed 2 percent inflationary adjustment and the actual appreciation rate of California property; as a consequence, the change in ownership provisions of Proposition 13, violate the equal protection clause of the federal Constitution, both upon their face and as applied. Appellants' position must be rejected for a variety of reasons.

(1) *The Applicable Legal Standards*

■ It is well established that the equal protection guaranty of the Fourteenth Amendment does not take from the states all power of classification. Most laws classify and many affect certain groups unevenly. Despite this fact, it has been held that "When the basic classification is rationally based, uneven effects upon particular groups within a class are ordinarily of no constitutional concern . . . . In assessing the equal protection challenge, a court is called upon only to measure the basic validity of the legislative classification." (*Personnel Administrator of Mass.* v. *Feeney* (1979) 442 U.S. 256, 272 [60 L.Ed.2d 870, 883, 99 S.Ct. 2282].)

The general principles applicable to the equal protection challenge to state tax legislation are equally settled. ■ As stated by the United States Supreme Court: " '[w]here taxation is concerned and no specific federal right, apart from equal protection, is imperiled, the States have large leeway in making classifications and drawing lines which in their judgment produce reasonable systems of taxation.' [Citation.] *A state tax law is not arbitrary although it 'discriminate[s] in favor of a certain class . . . if the discrimination is founded upon a reasonable distinction, or difference in state*

*policy,*' not in conflict with the Federal Constitution. [Citation.] This principle has weathered nearly a century of Supreme Court adjudication . . . ." (*Kahn v. Shevin* (1974) 416 U.S. 351, 355-356 [40 L.Ed.2d 189, 193, 94 S.Ct. 1734], fn. omitted, italics added; accord, *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 233-234 [149 Cal.Rptr. 239, 583 P.2d 1281], hereafter *Amador*.)

Consistent with the foregoing principles, it has been repeatedly held that "The latitude of discretion is notably wide in the classification of property for the purposes of taxation and the granting of partial or total exemptions upon grounds of policy" (*Royster Guano Co.* v. *Virginia* (1920) 253 U.S. 412, 415 [64 L.Ed. 989, 991, 40 S.Ct. 560]; *Haman v. County of Humboldt* (1973) 8 Cal.3d 922, 925-927 [106 Cal.Rptr. 617, 506 P.2d 993]); that there exists no iron rule of equality, prohibiting the necessary flexibility and variety to the schemes of taxation (*Allied Stores of Ohio* v. *Bowers* (1959) 358 U.S. 522, 526 [3 L.Ed.2d 480, 484, 79 S.Ct. 437]); and that so long as a system of taxation is supported by a rational basis and is not palpably arbitrary, it will be upheld despite the lack of a precise, scientific uniformity (*Kahn* v. *Shevin, supra*, 416 U.S. at p. 356, fn. 10 [40 L.Ed.2d at pp. 193-194]; see also *Amador, supra*, 22 Cal.3d at p. 234).

(2)   *The Equal Protection Issue Relative to Change in Ownership Was Conclusively Determined by Amador*

The California Supreme Court long ago laid to rest the equal protection challenge to the change in ownership provisions of Article XIII A in *Amador*; that decision remains unaffected by *Allegheny* and binds us here. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)

In *Amador* the Supreme Court pointed out that under settled rules a discriminatory taxation will be upheld against an equal protection challenge so long as the tax classification or disparity of tax treatment is founded upon some reasonable distinction or rational basis. (*Amador, supra*, 22 Cal.3d at pp. 234-235.) Thereafter the court concluded that the taxation of property at its acquisition value rather than its current value (i.e., market price) as required by Article XIII A, section 2, rests on a rational basis and fulfills a legitimate legislative goal inasmuch as the acquisition value system: (1) provides certainty in taxation; (2) brings about a fairer system in which unrealized paper gains generated by inflation are not taxed; and (3) does not unduly discriminate against persons who purchased their property after 1975, because these purchasers are taxed precisely the same way as the 1975 owners, i.e., based upon the acquisition value of property. The critical part of the opinion reads as follows: "By reason of section 2, subdivision (a), of

the article, except for property acquired prior to 1975, henceforth all real property will be assessed and taxed at its value *at date of acquisition* rather than at current value (subject, of course, to the 2 percent maximum annual inflationary increase provided for in subdivision (b)). *This 'acquisition value' approach to taxation finds reasonable support in a theory that the annual taxes* which a property owner must pay *should bear some rational relationship to the original cost of the property, rather than relate to an unforeseen, perhaps unduly inflated, current value. Not only does an acquisition value system enable each property owner to estimate with some assurance his future tax liability, but also the system may operate on a fairer basis than a current value approach.* For example, a taxpayer who acquired his property for $40,000 in 1975 henceforth will be assessed and taxed on the basis of that cost (assuming it represented the then fair market value). This result is fair and equitable in that his future taxes may be said reasonably to reflect the price he was originally willing and able to pay for his property, rather than an inflated value fixed, after acquisition, in part on the basis of sales to third parties over which sales he can exercise no control. On the other hand, a person who paid $80,000 for similar property in 1977 is henceforth assessed and taxed at a higher level which reflects, again, the price he was willing and able to pay for that property. Seen in this light, and contrary to petitioners' assumption, *section 2 does not unduly discriminate against persons who acquired their property after 1975, for those persons are assessed and taxed in precisely the same manner as those who purchased in 1975, namely, on an acquisition value basis predicated on the owner's free and voluntary acts of purchase. This is* an arguably *reasonable basis for assessment." Amador, supra,* 22 Cal.3d at p. 235, second and third italics added.) Based upon the foregoing analysis, the court sustained the constitutionality of the enactment in dispute by concluding: "We cannot say that the acquisition value approach incorporated in article XIII A, by which a property owner's tax liability bears a reasonable relation to his costs of acquisition, is wholly arbitrary or irrational. Accordingly, the measure under scrutiny herein meets the demands of equal protection principles." (*Id.* at p. 237.)[2]

Nevertheless, appellants contend that *Amador* does not control the resolution of the present case because: (a) *Amador* decided the constitutionality of Article XIII A, section 2, upon a facial challenge in the abstract without taking into account the vast disparities developed after the adoption of Proposition 13; (b) *Amador* focused on residential property and did not

---

[2] We parenthetically note that the constitutionality of the change in ownership provisions must be sustained for the additional reason that they promote two important state policy goals: (a) a strict limitation on real property taxes and (b) an assurance of a stable revenue source for the local governments. The advancement of these goals constitutes a crucial part of the integrated operation of Proposition 13 which was overwhelmingly adopted by the people of California.

address the rationality of the enactment vis-à-vis commercial property; and (c) in view of *Allegheny*, a recently decided United States Supreme Court case, *Amador* is of questionable authority and need not be followed. We disagree with appellants on each contention.

(a) *The Amador Court Did Consider the Tax Disparities in Deciding the Constitutionality of Article XIII A, Section 2*

■ Appellants first assert that *Amador* is not dispositive here because it decided the constitutional issue in the abstract (i.e., upon a facial attack) without considering the actual tax disparities that have developed since passage in 1978. Appellants' contention must fail for multiple reasons.

■ First, it is widely recognized that a facial attack on the constitutionality of an enactment carries a heavier burden than an attack based on facts resulting from the enactment of legislation. As stated in *United States* v. *Salerno* (1987) 481 U.S. 739, 745 [95 L.Ed.2d 697, 707, 107 S.Ct. 2095]: "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."

■ Moreover, contrary to appellants' assertion, the *Amador* court did recognize that a serious and substantial attack on Proposition 13 existed which could result in properties of the same current market value having markedly different assessed valuations. This appears in both the majority opinion and the dissent. The majority uses an example that under Proposition 13 property purchased for $40,000 in 1975 will be assessed at that value, while similar property bought in 1977 (only two years later) for $80,000 will be taxed double, i.e., the disparity ratio can reach two to one within only two years! (*Amador, supra*, 22 Cal.3d at p. 235.) The dissent further emphasizes this growing disparity by providing additional examples of difference in tax levels developed within a short time period. (*Id.* at pp. 249-250.)

Finally, this uneven taxation result under Proposition 13 was also highlighted in the voter pamphlet which was presented to, and considered by, the *Amador* court. For example, rebuttal to arguments in favor of Proposition 13 emphasized that the proposition "PLACES a disproportionate and unfair tax burden on anyone purchasing a home after July 1, 1978; . . ." The argument against Proposition 13 stated the theme in even stronger language: "Homeowners living in identical side-by-side houses will pay *vastly different* property tax bills . . . ." (Italics added.)

In sum, since the stipulated difference of the tax burden between appellants' property and that of their competitors is approximately 2.5 to 1 and

since just such a disparity in tax rates was considered and approved by the *Amador* court when it passed upon the constitutionality of Proposition 13, appellants cannot well claim that when applied to the present facts the *Amador* holding is unreasonable; much less can they successfully assert that had it been supplied with the new data, the Supreme Court would have reached a different result in *Amador*.

### (b) *Amador Applies to Commercial Property as Well as Residential Property*

Appellants next claim that in deciding the constitutionality of Article XIII A, section 2, *Amador* focused on residential property and left undecided the issue whether the change in ownership provisions of Proposition 13 had a rational basis vis-à-vis commercial property. Appellants maintain that while the state may have a legitimate interest in not taxing homeowners on unrealized, inflated property values, the same rationale does not apply to commercial property.

This proposition of appellants also suffers from several weaknesses. First of all, in upholding the constitutionality of the change in ownership provisions of Proposition 13 against an equal protection challenge, *Amador* does not distinguish between residential and commercial property. In the absence of such distinction we have no reason to conclude or infer that the court intended to apply a separate set of constitutional rules to each type of property. Moreover, the policy reasons stated by *Amador* in order to justify the reasonableness of the enactment and the legitimate state objectives promoted thereby (i.e., achievement of certainty and predictability in taxation; assurance of a stable source of revenue for the local governments; uniform taxation of all taxpayers based on the acquisition value, etc.) are equally applicable to both residential and commercial property. The obvious fallacy of appellants' contention lies in the circumstance that it highlights only one of the policy factors justifying the reasonableness of the enactment, but ignores all others, although the latter are equally relevant to sustain the classification not only as to residential, but also as to commercial property. ■ It is, of course, well settled that "There is a presumption of constitutionality which can be overcome 'only by the most explicit demonstration that a classification is a hostile and oppressive discrimination against particular persons and classes.' . . . *'The burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it.'*" (*Lehnhausen* v. *Lake Shore Auto Parts Co.* (1973) 410 U.S. 356, 364 [35 L.Ed.2d 351, 358, 93 S.Ct. 1001], italics added.)

(c)   *Allegheny Is Inapplicable to Proposition 13 and Does Not Affect the Continued Validity of Amador*

■■■   Appellants' central attack on the constitutionality of Article XIII A, section 2, and the precedential force of *Amador* is based on *Allegheny*, a recently decided United States Supreme Court case. *Allegheny* is cited by appellants for two distinct purposes: First, it is contended that the equal protection challenge under *Allegheny* is met only if there is a seasonable attainment of a rough equality in the tax treatment of comparable properties which, for the reasons set out above, cannot be achieved under the property tax system established by Proposition 13, and based upon this premise, appellants conclude that the change in ownership provisions of Article XIII A must be declared unconstitutional and that *Amador* should be reassessed in view of *Allegheny*; second, it is argued that, under *Allegheny* and the federal cases cited therein, the intentional, systematic undervaluation of comparable property or the dramatic differences in valuation between recently transferred and other comparable property must be deemed ipso facto unconstitutional. Neither of appellants' points is well taken.

Appellants' first proposition must fail for two fundamental reasons: (1) *Allegheny* grew out of a different legal and factual background and, thus, is distinguishable from the instant case; (2) *Allegheny* expressly refused to pass upon the constitutionality of Article XIII A, section 2, and, hence, left the precedential force of *Amador* unaffected.

In *Allegheny* the grossly disparate assessment of comparable neighboring property (a ratio varying from 8 to 35 to 1, the equalization of which would have required more than 500 years) was made by the county assessor in violation of the West Virginia state Constitution, which mandated that all property, real or personal, be taxed in proportion to its value.[3] That the *Allegheny* holding was predicated on the irrational enforcement policy of the assessor in contravention of the state constitution appears from the language of the opinion itself. After declaring that the state has broad power to make different classifications and assign to each class a different tax burden, the *Allegheny* court emphasized: "But West Virginia has not

---

[3] The precise issue raised and decided by *Allegheny* is clearly stated in the introduction to the opinion: "The West Virginia Constitution guarantees to its citizens that, with certain exceptions, 'taxation shall be equal and uniform throughout the State, and all property, both real and personal, shall be taxed in proportion to its value . . . .' W. Va. Const., Art. X, § 1. The Webster County tax assessor valued petitioners' real property on the basis of its recent purchase price, but made only minor modifications in the assessments of land which had not been recently sold. This practice resulted in gross disparities in the assessed value of generally comparable property, and we hold that it denied petitioners the equal protection of the laws guaranteed to them by the Fourteenth Amendment." (*Allegheny, supra,* 488 U.S. at p. 338 [102 L.Ed.2d at pp. 693-694].)

drawn such a distinction. Its Constitution and laws provide that all property of the kind held by petitioners shall be taxed at a rate uniform throughout the State according to its estimated market value . . . . We are not advised of any West Virginia statute or practice which authorizes individual counties of the State to fashion their own substantive assessment policies independently of state statute. [Citation.] The Webster County assessor has, apparently on her own initiative, applied the tax laws of West Virginia in the manner heretofore described, with the resulting disparity in assessed value of similar property . . . ." (*Id*. at p. 345 [102 L.Ed.2d at p. 698].)

The distinction between *Allegheny* and the present case is obvious. While property taxation in West Virginia is based upon the ad valorem (i.e., current or market value) system, Proposition 13 follows the acquisition date system under which all real property is assessed and taxed on the basis of its value at the date of its acquisition. Since the provisions of Proposition 13 are enshrined in the California Constitution, in reassessing appellant's property at the time of the change in ownership, respondent county proceeded in full compliance with (rather than in violation of) the California Constitution. In other words, the striking difference between *Allegheny* and the case herein is that while the California acquisition value system is founded on the Constitution and state policy and respondent county proceeded in harmony therewith, the West Virginia Constitution is based on the current value system of taxation which was violated by the county assessor who, in essence, assessed comparable property according to its value on the date of acquisition.

The crucial difference between the West Virginia Constitution and California's Proposition 13 did not escape the Supreme Court's scrutiny in *Allegheny*. While coming to the conclusion that the West Virginia county assessor's grossly unequal treatment of comparable property did violate the precepts of equal protection, the high court specifically refused to extend its holding to California. Rather, by suggesting that Proposition 13 is based on the premise that taxes should not be based on unrealized paper gains in the value of property, the court left the constitutionality of Article XIII A, section 2 undecided: "*We need not and do not decide today whether the Webster County assessment method would stand on a different footing if it were the law of a State, generally applied, instead of the aberrational enforcement policy* it appears to be. The State of California has adopted a similar policy as Article XIIIA of its Constitution, popularly known as 'Proposition 13.' Proposition 13 generally provides that property will be assessed at its 1975-1976 value, and reassessed only when transferred or constructed upon, or in a limited manner for inflation. Cal. Const., Art. XIIIA, § 2 (limiting inflation adjustments to 2% per year). The system is grounded on the belief that taxes should be based on the original cost of property and

should not tax unrealized paper gains in the value of the property." (*Allegheny, supra*, 488 U.S. at p. 344, fn. 4 [102 L.Ed.2d at p. 698], italics added.)

Appellants' contention that *Allegheny* is indistinguishable because California (not unlike West Virginia) has retained the ad valorem (current or fair market value) system of taxation even after the adoption of Proposition 13, does not withstand scrutiny.

While California Constitution, article XIII, section 1, states that unless otherwise provided all property is taxable and shall be assessed at the same percentage of fair market value, the cases unanimously hold that Proposition 13 introduced a new system of taxation based on the acquisition date value: "By reason of section 2, subdivision (a) of the article [XIII A], except for property acquired prior to 1975, henceforth all real property will be assessed and taxed at its value *at date of acquisition* rather than at current value . . . ." (*Amador, supra*, 22 Cal.3d at p. 235, original italics.) Later on, the court reaffirmed the same premise by setting out that "*In converting from a current value method to an acquisition value system*, the framers of article XIII A chose not to 'roll back' assessments any earlier than the 1975-1976 fiscal year" (*id*. at p. 236, italics added) and by reiterating that "*The change from a current value system to an acquisition value method* is intended to benefit *all* property owners . . . ." (*Id*. at p. 238, first italics added.) *State Bd. of Equalization* v. *Board of Supervisors* (1980) 105 Cal.App.3d 813 [164 Cal.Rptr. 739], a case cited by appellants, further corroborates that *Proposition 13 "uses an acquisition value approach* for real property *rather than a current fair market value standard*." (*Id*. at p. 822, italics added.)

Appellants' second major attack on the constitutionality of Article XIII A, section 2, rests on the general proposition that " '[I]ntentional systematic undervaluation by state officials of other taxable property in the same class contravenes the constitutional right of one taxed upon the full value of his property.' " (*Allegheny, supra*, 488 U.S. at p. 345 [102 L.Ed.2d at p. 698]; see also *Cumberland Coal Co.* v. *Board* (1931) 284 U.S. 23, 28 [76 L.Ed. 146, 149-150, 52 S.Ct. 48]; *Sioux City Bridge* v. *Dakota County* (1923) 260 U.S. 441, 445 [67 L.Ed. 340, 342-343, 43 S.Ct. 190, 28 A.L.R. 979]; *Hillsborough* v. *Cromwell* (1946) 326 U.S. 620, 623 [90 L.Ed. 358, 363, 66 S.Ct. 445].) Appellants maintain that the disparity of taxation in the ratio of 2.5 to 1 between their store and those of their competitors and the disparity ratio of 3 to 1 countywise, evince such dramatic differences in the evaluation of comparable property that they constitute a per se violation of equal protection. We are compelled to disagree with appellants for several reasons.

To begin with, *Allegheny* fails to express any per se rule of an equal protection violation. Instead, it reiterates the well-established principles

that a difference in taxation will be upheld against an equal protection challenge as long as the discrimination is founded upon a reasonable distinction or reasonable state policy. "The States, of course, have broad powers to impose and collect taxes. A State may divide different kinds of property into classes and assign to each class a different tax burden so long as those divisions and burdens are reasonable . . . . In each case, '[i]f the selection or classification is neither capricious nor arbitrary, and rests upon some reasonable consideration of difference or policy, there is no denial of the equal protection of the law.' [Citation.]" (*Allegheny, supra,* 488 U.S. at p. 344 [102 L.Ed.2d at p. 697-698], fn. omitted.)

Furthermore, the proposition that the intentional, systematic undervaluation of property similarly situated with other property assessed at its full value constitutes an improper discrimination in violation of equal protection was raised and negatively answered in *Amador*. In analyzing *Cumberland, Sioux City Bridge* and *Hillsborough* (i.e., the very cases cited in *Allegheny*) the California Supreme Court concluded that those cases are distinguishable because: (a) they decided the constitutionality of legislative schemes which were based on the current market value system (as opposed to Prop. 13 which is founded on the acquisition date system); and (b) at any rate those cases did *not* change the general rule whereby the constitutionality of a tax enactment will be upheld if founded on a reasonable distinction or rational basis.[4] We fail to see why we should deviate from these sound principles espoused by our Supreme Court.

In rejecting appellants' complaint that a disparity of taxation between comparable commercial property amounts to an equal protection violation per se, we also invoke the often-stated rule that wide flexibility is permitted the states in the enforcement and interpretation of their tax laws; that there is no iron rule of equality in imposing taxes; and that the states are free to grant partial or total exemptions upon grounds of reasonable state policy. (See discussion, *ante*.) "[T]he Legislature is empowered to grant total or partial exemptions from property taxation on behalf of various classes (e.g., veterans, blind or disabled persons, religious, hospital or charitable property; see art. XIII, § 4), despite the fact that similarly situated property may be taxed at its full value. In addition, homeowners receive a partial exemption from taxation [citation] which is unavailable to other property owners.

---

[4] In the exact words of the court: "The foregoing cases, however, involved constitutional or statutory provisions which *mandated* the taxation of property on a *current value* basis. These cases do not purport to confine the states to a current value system under equal protection principles or to state an exception to the general rule accepted both by the United States Supreme Court and by us, as previously noted, that a tax classification or disparity of tax treatment will be sustained so long as it is founded upon some reasonable distinction or rational basis." (*Amador, supra,* 22 Cal.3d at p. 235, original italics.)

As noted previously, the state has wide discretion to grant such exemptions. [Citation.]" (*Amador, supra,* 22 Cal.3d at p. 236.)

In summary, the constitutionality of Article XIII A, section 2, must be sustained against appellants' equal protection challenge because: (1) This very issue was conclusively adjudicated by *Amador,* which held Proposition 13 constitutional; (2) *Allegheny* is so factually distinguishable from the present case that it is not controlling; (3) *Allegheny* expressly refused to decide the constitutionality of the change in ownership provisions of Proposition 13, leaving *Amador's* validity intact; and (4) under the time-honored doctrine of stare decisis we are duty bound to follow *Amador* until it is overruled by a higher court. (*Auto Equity Sales, Inc.* v. *Superior Court, supra,* 57 Cal.2d at p. 455; see also *Birkhofer* v. *Krumm* (1938) 27 Cal.App.2d 513, 536-537 [81 P2d 609].)

### B.  *Article XIII A Does Not Interfere With Interstate Mobility*

■    On a different front, appellants attack the constitutionality of Article XIII A on grounds that it interferes with interstate mobility (i.e., right to travel). Appellants claim that an unequal taxation under Proposition 13 impedes the free movement of people inasmuch as it imposes a heavier tax burden on newly arrived property owners than on established California residents. Appellants maintain that the limitation on the right to travel is legally significant in two respects: (1) it comprises a violation of an independent, fundamental constitutional right (*Shapiro* v. *Thompson* (1969) 394 U.S. 618, 630 [22 L.Ed.2d 600, 612-613, 89 S.Ct. 1322]); (2) it calls for a higher standard of review (i.e., the strict scrutiny test) as opposed to the less stringent "rational basis" for determining equal protection challenges (*Attorney General of N.Y.* v. *Soto-Lopez* (1986) 476 U.S. 898, 904 [90 L.Ed.2d 899, 906, 106 S.Ct. 2317]; *Cleburne* v. *Cleburne Living Center, Inc.* (1985) 473 U.S. 432, 440 [87 L.Ed.2d 313, 320-321, 105 S.Ct. 3249]).

However, the unequal taxation under Proposition 13 does not impede interstate travel as defined by the United States Supreme Court, which has invoked the "right to travel" only in cases involving invidious discrimination, durational residential requirements or direct restrictions on interstate or foreign travel. (*Memorial Hospital* v. *Maricopa County* (1974) 415 U.S. 250 [39 L.Ed.2d 306, 94 S.Ct. 1076]; *Dunn* v. *Blumstein* (1972) 405 U.S. 330 [31 L.Ed.2d 274, 92 S.Ct. 995]; *Kent* v. *Dulles* (1958) 357 U.S. 116 [2 L.Ed.2d 1204, 78 S.Ct. 1113]; *Shapiro* v. *Thompson, supra,* 394 U.S. at p. 630 [22 L.Ed.2d at pp. 612-613]; see also *CEEED* v. *California Coastal Zone Conservation Com.* (1974) 43 Cal.App.3d 306, 331 [118 Cal.Rptr. 315].) Proposition 13 does not impose direct restrictions on interstate travel, nor does it discriminate against non-California property owners, nor does it

impose durational/residence requirements on interstate mobility. Proposition 13 classifies real property for assessment and taxation not upon residency, but rather upon the acquisition date value of property—it uniformly applies to residents and nonresidents alike. Under this scheme nonresidents who had purchased their property at an earlier date may in fact enjoy a tax advantage over California residents who acquired their property subsequently.[5] In brief, Proposition 13 is neutral and uniform in its application and does not discriminate directly or indirectly based upon residency. For this very reason, the cases cited by appellants (*Hooper* v. *Bernalillo County Assessor* (1985) 472 U.S. 612 [86 L.Ed.2d 487, 105 S.Ct. 2862]; *Zobel* v. *Williams* (1982) 457 U.S. 55 [72 L.Ed.2d 672, 102 S.Ct. 2309]; *Shapiro* v. *Thompson, supra,* 394 U.S. 618) are distinguishable because the legislative classifications therein were all based upon length of residence. For instance, in *Hooper* the statute gave tax relief to Vietnam veterans only if they settled in the state before a specified date; in *Zobel* the statute conditioned the payment of oil dividends to Alaska residents on the length of residence in the state; and in *Saphiro* the legislation denied welfare benefits to newcomers based on residency.

Yet another reason compels rejection of appellants' claim predicated on an alleged violation of right to travel. It is well settled that even if an enactment affects interstate travel, it still must be sustained against a constitutional attack if the invasion is inconsequential and does not unreasonably burden freedom of movement. (*Shapiro* v. *Thompson, supra,* 394 U.S. at p. 629 [22 L.Ed.2d at p. 612]; *CEED* v. *California Coastal Zone Conservation Com., supra,* 43 Cal.App.3d at p. 331.) Consistent therewith, our Supreme Court in *Amador* rejected a similar argument by holding that the new property tax system introduced by Proposition 13 did not deter or limit the right to travel: "The change from a current value system to an acquisition value method is intended to benefit *all* property owners, past and future, resident and nonresident, by reducing inflationary increases in assessments, by limiting tax rates, and by permitting the taxpayer to make more careful and accurate predictions of future tax liability. Under the former system, it was arguable that prospective purchasers of real property might have been deterred from purchasing (thereby impairing their right to travel) by reason of the unpredictable nature of future property tax liability resulting from unlimited inflationary pressures. Certainly, *travel is inhibited to no greater extent by the new system,* which establishes a more fixed and stable measure *than that imposed by the former system of unconstrained*

---

[5] We note that appellants' "new comers" versus "old residents" argument rings especially hollow in view of the fact they are not "new comers," but longtime property owners in California who had enjoyed the tax benefits of Proposition 13 until the 1986 corporate restructuring conducted with the full knowledge that by doing so they would fall within the change-in-ownership provisions of Article XIII A with the attendant increased tax burden.

*property taxation* based on current values. *Accordingly, we hold that the right to travel is not unconstitutionally impaired by article XIII A.*" (*Amador, supra,* 22 Cal.3d at p. 238, first italics in original.) This *Amador* conclusion is dispositive of the right to travel issue resurrected by appellants. (*Auto Equity Sales, Inc.* v. *Superior Court, supra,* 57 Cal.2d at p. 455.)

Since we have concluded that Proposition 13 does not significantly impede interstate mobility within the purview of the federal Constitution, appellants' alternative contention that we should reweigh their equal protection claim under the strict scrutiny (compelling state interest) test automatically fails. (*Fair Political Practices Com.* v. *Superior Court* (1979) 25 Cal.3d 33, 47 [157 Cal.Rptr. 855, 599 P.2d 46].)

### C. *The Change-in-Ownership Provisions of Article XIII A Do Not Unduly Burden Interstate Commerce*

■ Finally, appellants claim that Article XIII A, section 2, places an undue burden on interstate commerce because it gives a competitive edge to established property owners. (*Complete Auto Transit, Inc.* v. *Brady* (1977) 430 U.S. 274. [51 L.Ed.2d 326, 97 S.Ct. 1076]) We reject the contention summarily for three reasons.

First, Article XIII A does not restrict interstate commerce because it taxes only real property within the state. It is widely recognized that interstate commerce deals with the flow of goods and services between and among the several states (*Bacchus Imports, Ltd.* v. *Dias* (1984) 468 U.S. 263, 271 [82 L.Ed.2d 200, 209, 104 S.Ct. 3049]; see also *City of Oakland* v. *Oakland Raiders* (1985) 174 Cal.App.3d 414, 419 [220 Cal.Rptr. 153]), and that "A tax on property or upon a taxable event in the state, apart from operation, does not interfere [with interstate commerce]." (*Southern Pac. Co.* v. *Gallagher* (1939) 306 U.S. 167, 178 [83 L.Ed. 586, 593, 59 S.Ct. 389].) This is consistent with *Complete Auto* which declares that a statute is unconstitutional only if the tax is on the privilege of doing business rather than tax on property in the state. (*Complete Auto Transit, Inc.* v. *Brady, supra,* 430 U.S. at p. 284 [51 L.Ed.2d at p. 334]; accord, *Railway Express Agency* v. *Virginia* (1954) 347 U.S. 359, 367 [98 L.Ed. 757, 764, 4 S.Ct. 558].)

Second, it is well established that before a state tax or regulation can be declared unconstitutional under the commerce clause, there must be a showing that it has imposed a burden on interstate or foreign commerce. (*Halliburton Oil Well Co.* v. *Reily* (1963) 373 U.S. 64, 69 [10 L.Ed.2d 202, 206, 83 S.Ct. 1201]; *American President Lines, Ltd.* v. *Franchise Tax Bd.*

(1970) 3 Cal.App.3d 587, 591 [83 Cal.Rptr. 702].) Appellants failed to supply such proof.

Third, appellants' commerce clause argument is, in essence, only a restatement of their "interstate mobility" contention which has been soundly rejected by *Amador* and finds no legal support in federal case law either.

## IV. CONCLUSION

The United States Supreme Court expressly recognized and then refused to tinker with Proposition 13 in its recent *Allegheny* decision. That leaves untampered the California Supreme Court's *Amador* decision that Proposition 13 violates neither the equal protection clause nor the right to travel. With this long-settled law of California, we may neither tinker nor tamper. The judgment is affirmed.

Perley, J., and Reardon, J., concurred.

Appellants' petition for review by the Supreme Court was denied February 28, 1991. Kennard, J., was of the opinion that the petition should be granted.